UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-22958-CIV-SEITZ/TURNOFF

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

SECRETARY, FLORIDA DEPARTMENT OF
CORRECTIONS, *et al.,*

        Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on cross-motions for summary judgment.[1]  The

United States sued Defendants alleging violations of the Religious Land Use and

Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc (RLUIPA)[2] because Defendants did

not serve kosher meals to those prisoners whose religious beliefs require kosher meals.

Defendants subsequently announced their intention to provide kosher meals to prisoners whose

religious beliefs require such meals, through the implementation of a Religious Diet Program

(RDP).  The United States also alleges that certain aspects of the RDP violate RLUIPA.

---

[1] The filings include the United States' Motion for Summary Judgment [DE-443], Defendants' Renewed Motion for Summary Judgment [DE-442], and the parties' responses and replies [DE-449, 453, 457, 458].  In addition, the parties have filed supplemental memoranda at the Court's request [DE-485, 486, 488] and a Joint Statement of Undisputed Facts [DE-487].

[2] This action was filed pursuant to 42 U.S.C. § 2000cc-2(f), which gives the Department of Justice the authority to enforce compliance with § 2000cc-1 by an action for injunctive relief or declaratory relief on behalf of the United States which has an obligatory interest in protecting the religious liberty of all prisoners.

After the case was filed, the parties sought a stay in order to negotiate a settlement, which the Court granted.  The parties were unable to reach a settlement.  Although Defendants agreed to begin serving kosher meals to prisoners, Defendants would not agree to entry of an order holding that they were required by law to provide the kosher meals.  The stay was lifted and the United States sought a preliminary injunction ordering Defendants to provide kosher meals to those prisoners with a sincere religious belief for eating kosher and enjoining enforcement of some of Defendants' policies implementing the RDP.  The Court granted a preliminary injunction, which was later vacated by the Eleventh Circuit.

The United States now seeks declaratory relief and a permanent injunction requiring Defendants to serve kosher meals and enjoining the implementation of three challenged RDP policies.  Defendants, on the other hand, seek a determination that RLUIPA does not require them to provide kosher meals to prisoners and that the challenged policies are valid under RLUIPA.[3]  If the Court finds that any of Defendants' policies violate RLUIPA, it must then determine whether a permanent injunction is appropriate under the Prison Litigation Reform Act (PLRA).  Because Defendants' denial of kosher meals and two of the challenged RDP policies violate RLUIPA and the requirements of the PLRA have been met, the United States' summary judgment motion for declaratory and injunctive relief is granted in part.  Because the third challenged RDP provision does not violate RLUIPA, Defendants' motion for summary judgment is granted in part.

---

[3]Defendants also seek summary judgment declaring that the RDP's anti-bartering policy is valid.  The United States does not challenge the anti-bartering policy and, thereby, concedes its validity.  Thus, Defendants are entitled to summary judgment on this issue.

## I. Undisputed Material Facts[4]

Defendant the Florida Department of Corrections (FDOC) incarcerates approximately 100,000 prisoners in over 60 facilities. Approximately ten percent of Florida prisoners are incarcerated in privately operated facilities. FDOC's 2014-2015 operating budget is $2.3 billion and its food budget is just over $54 million. FDOC receives federal funds and is subject to RLUIPA.

FDOC incarcerates prisoners who have a sincere religious basis for keeping kosher. The parties agree that the inability to consume a kosher diet substantially burdens the religious exercise of Florida prisoners with a sincere desire to keep kosher.

*Defendants' History With Kosher Meals*

Prior to 2004, Defendants did not offer a kosher diet to any prisoners. In 2004, Defendants implemented a kosher meal plan known as the Jewish Dietary Accommodation Program (JDAP), which offered kosher meals to prisoners in thirteen FDOC facilities. Prisoners eligible to participate in JDAP were transferred to one of the thirteen facilities. Initially JDAP was open only to Jewish prisoners, but in 2006 it was opened to prisoners of all faiths. FDOC terminated the JDAP program in August 2007. In August 2010, FDOC instituted a pilot kosher diet program at the South Florida Reception Center. Enrollment in the pilot program ranged from 8 to 18 prisoners.

When this litigation started in August 2012, other than the pilot program, Defendants offered only three meal options to most prisoners: (1) mainline; (2) vegan; and (3) the alternative,

---

[4]Facts without record citations can be found in the parties' Joint Statement of Undisputed Facts [DE-487].

no-meat option to the mainline entree.  In addition, Defendants also provided various medical and therapeutic diets prescribed by FDOC personnel for approximately 3,500-3,600 prisoners. None of these food options are kosher.  Prisoners with religious diet needs had only the three non-medical diets to choose from unless they were one of the prisoners participating in the pilot program.

On March 22, 2013, FDOC issued new policy 503.006, establishing the RDP.  (DE-29-8.) At that time, FDOC had approximately 8,500-8,700 prisoners who self-identified with a religion that would require a kosher meal.  (DE-68 at 46-47.)  Thereafter, the United States amended its complaint to challenge both the blanket denial of kosher meals to those prisoners with a sincere religious belief for eating kosher and some of Defendants' new dietary policies.  (DE-104.)  On December 6, 2013, the Court issued a Preliminary Injunction ordering Defendants to provide kosher meals to those inmates with a sincere religious belief requiring them to eat kosher and enjoining the enforcement of four provisions of the RDP.[5]  (DE-106.)  Defendants appealed. (DE-120.)  On February 27, 2015, the Eleventh Circuit denied Defendants' appeal as moot and vacated the Preliminary Injunction based on the injunction's failure to comply with the requirements of the PLRA.  (DE-468.)

---

[5]Specifically, in addition to requiring Defendants to provide kosher meals, the preliminary injunction enjoined Defendants from: (1) enforcing a ninety-day waiting period for entering the RDP; (2) asking RDP applicants to identify specific religious doctrine as part of Defendants' sincerity testing; (3) enforcing a rule known as the ten percent rule; and (4) enforcing a rule known as the zero tolerance rule.  Defendants, implicitly recognizing that it violates RLUIPA, voluntarily withdrew the ninety-day waiting period policy from the RDP, and both parties are no longer pursuing it in this litigation.

*The Religious Diet Program*

Under the RDP, the religious diet needs of prisoners are met through three options: (1) the previously-offered alternate, non-meat entree from the mainline; (2) the previously-offered vegan meal option; and (3) the newly-offered Certified Food Option (CFO), which is a kosher food option.[6]  (DE-29-8.)  Prisoners seeking to participate in the CFO must submit an application.  (DE-29-8.)  While the questions on the application have changed during the course of this litigation, at some point the application included the following question: identify "specific law(s) connected to your belief or faith that require(s) you to eat a religious diet."  (DE-99-8 at 13.)  While that question is not currently included on the application, Defendants maintain that it is a valuable screening tool and a permissible question under the law.[7]  Thus, both parties' motions for summary judgment address the use of this question.

The RDP also includes enforcement provisions, which allow for suspension and expulsion from the RDP.  Two particular enforcement policies are at issue, both of which specifically address enforcement of the CFO meal option.[8]  The first states that an "inmate

---

[6]Originally, the CFO consisted of prepackaged processed foods (DE-29-8; 442-2 at ¶4) and included two hot meals a day.  However, the CFO was substantially modified and now consists of all cold meals (DE-442-2 at ¶4), comprised of peanut butter, cold cereal, and bread for breakfast every day and a mix of some of the following for lunch and dinner every day: sardines, cabbage, beans, carrots, peanut butter, bread or crackers, and an occasional piece of fruit.  While the record is not entirely clear, it appears that the switch to all cold meals occurred in late summer 2014.

[7]Despite removal of the question from the application, Defendants have continued to access the sincerity of applicants and the Chaplaincy Administrator testified that a prisoner could still be sincere without having that doctrinal knowledge.  (DE-443-26 at 103:1-25.)

[8]As noted earlier, the United States is no longer pursuing claims relating to the ninety-day waiting period.

enrolled in the CFO who misses ten percent (10%) or more of her/his CFO meals within a month will be removed from the CFO" (the ten percent rule).  (DE-29-8.)  The second suspends a prisoner from the CFO if he is discovered purchasing, possessing, or consuming food from the canteen or other source that violates the religious diet requirements (the zero tolerance rule[9]). (DE-29-8.)  If a prisoner feels that he has been improperly removed from the CFO under either of these rules, he may use the prison's grievance process to seek reinstatement earlier than would otherwise be permitted under the RDP.  (DE-442-6 at 93:6-10.)  During the grievance process, which, Defendants represented at oral argument, can take up to thirty days, the prisoner must eat from the mainline.

    After entry of the Preliminary Injunction, Defendants maintained that the injunction prevented them from implementing any of the RDP's enforcement provisions.  (DE-246.) However, despite this position, the Court and the parties, recognizing the need for enforcement provisions, were able to reach an agreement as to such provisions that would not violate the terms of the Preliminary Injunction.  (DE-259.)  Under the agreed enforcement provisions, a prisoner who violates the ten percent or zero tolerance rule will receive a notice and have an opportunity to explain his actions to a chaplain before any suspension or removal can occur. (DE-252-1.)  Based on the prisoner's explanation to the chaplain, the chaplain has the discretion to suspend the prisoner from or keep the prisoner in the RDP.  (DE-252-1.)  This process is very similar to the process already in use by FDOC for the nearly 5,000 prisoners on medical and vegan diets.  (DE-268-3 at 99:17-100:8; DE-268-4 at 22:4-25:4.)

---

[9]Defendants object to the use of this term as misleading and inflammatory.  However, the parties and the Court have been using this term throughout the litigation.  Consequently, the Court will continue to use this term to describe the policy at issue.

FDOC began serving meals under the RDP in July 2013 at a single institution. Since that time, Defendants have extended the RDP to additional institutions and their goal was to have it implemented in all state institutions by the end of April 2015. As of March 15, 2015, there were 9,543 prisoners approved for the CFO option of the RDP statewide out of the over 100,000 state prisoners.[10] However, participation rates at the five facilities that have been serving the RDP for approximately one year have dropped from 3,232 prisoners in April 2014 to 1,031 prisoners in February 2015. (DE-443-3 at 5.) FDOC officials expect to see declines at all institutions after the RDP has been in place for some time. (DE-443-9 at 47:14-48:5.) While one of the United States' experts opined that he expects participation rates to drop to around a range of 1.5% to 2%, the expert based his opinion on the experience of the Federal Bureau of Prisons (BOP) and does not appear to have considered whether BOP's and FDOC's prisoner populations have similar demographics.[11] (DE-443-17 at 14-16.) None of the experts could predict how long it would take for the participation rate to drop down to their expected levels. (DE-270-2 at 185:4-17.)

*Enforcement of the RDP*

To track how many prisoners pick up their meals, Defendants have invested $86,000 in electronic scanners and laptops and require a prisoner to scan an identification card upon entering

---

[10]Throughout their papers, the parties use the term RDP to refer to the CFO option of the RDP. Because the CFO option is the only relevant option in this litigation, the Court will use the terms interchangeably.

[11]Demographics are relevant to the analysis because they would indicate how many prisoners belong to a religion with known dietary needs. For example, a prison system with a high percentage of Jewish or Muslim prisoners would be expected to have a higher number of prisoners seeking a kosher diet than a prison system with few Jewish and Muslim prisoners.

the food line.  Defendants purchased the scanners as a way to ensure that only those prisoners approved for the RDP eat from the RDP.  However, the scanners are not used to prevent an RDP-enrolled prisoner from eating from the mainline.  Defendants use the scanners for tracking participation in both the mainline and the RDP.  Based on the information gathered from the scanners, one FDOC food service director testified that in one month, some of the 192 prisoners approved for the RDP at his institution ate 2,600 non-RDP meals.  (DE-449-1 at 58:9-11.)  Yet, the same food service director was unaware of any inmates who had been removed from the RDP for eating the mainline meal.  (DE-449-1 at 59:11-14.)

One chaplain testified that when inmates give a non-religious reason for wanting to be in the RDP he offers them religious reasons for wanting to be in the RDP and lets them choose A, B, C, or all of the above.  (DE-442-6 at 51:10-52:6.)  That same chaplain testified that he has not done anything to enforce canteen purchase violations, i.e. purchases of non-kosher products.  (DE-442-6 at 71:6-72:8.)  He also testified that he was never instructed to take any action against RDP approved inmates who eat the mainline meal and to his knowledge inmates who eat off the mainline are not supposed to be suspended from the RDP.  (DE-442-6 at 86:18-21; 87:18-24; 88:18-23.)  FDOC's Chaplaincy Administrator testified that he directed chaplains at all RDP-participating facilities not to remove inmates from the RDP for eating off the mainline.  (DE-443-10 at 113:7-15.)  In fact, the Chaplaincy Administrator had no knowledge of any prisoner being removed from the RDP for eating off the mainline.  (DE-443-10 at 113:16-25.)   A food service staff member at Union Correctional Institute testified that the central office instructed the staff to stop suspending inmates from the RDP.  (DE-443-23 at 46:17-24.)  Thus, Defendants are

not using the enforcement provisions of the RDP to suspend prisoners who violate the RDP rules.

*The Costs of the RDP*

The costs associated with the RDP include the cost of food, the cost of additional equipment, and the cost of additional staffing. The parties agree that the total future costs of the RDP will be between $384,400 and $12.3 million per year. This wide variation is due to the parties' differing estimates of the long-term participation rate, the United States' use of the pick-up rates to reduce the daily costs, Defendants' inclusion of the costs of the equipment used to track participation in the RDP and the mainline, and Defendants' inclusion of additional staffing costs. Defendants have allotted the entire cost of the scanners, laptops, and servers to the RDP, even though the equipment is also used for tracking mainline participation. In addition, Defendants also include 100% of the costs for additional chaplaincy and food service staff, regardless of whether the staff-members devote 100% of their time to the RDP. Defendants describe their calculations as based on the "worst case scenario" with variables that will change over time. (DE-443-7 at 61:12-15.)

At oral argument, Defendants asserted that to date they have spent $3.9 million implementing the RDP. However, Defendants did not provide a breakdown of that number. Defendants have not provided clear numbers for many of the costs they associate with the RDP. For example, Defendants assert that they have hired additional food service and chaplaincy staff specifically for the RDP, but Defendants have not provided a list of that staff and the cost of hiring each person. Nor is it clear whether that $3.9 million includes the actual cost of the RDP food served up until that time. Thus, the total costs to date remain somewhat obscure.

The last known costs for the CFO meal is $3.554 per prisoner per day compared to $1.888 per prisoner per day for the mainline meal. These costs are based on a 100% prisoner participation rate. However, the statewide average for participation on the mainline is 85%. (DE-443-1 at 19:7-8.[12]) The average participation rate for the CFO meal is 75%. (DE-442-3 at 23:3-11.) As a result, food service directors order their food based on known participation rates, not 100% participation. (DE-443-1 at 20:8-14.) Mainline costs are also reduced by between 10 and 15 cents per day through the use of FDOC's farm produce program. (DE-443-1 at 19:11-13.) Defendants have not factored in any of the savings from the farm program to the cost of the RDP. (DE-443-9 at 52:4-10.) The cost of Defendants' medical and therapeutic diets ranges from $2.00 to $3.05 per day per inmate for the approximately 3,600 prisoners on those diets. (DE-443-1 at 31:18-25; 35:1-6.)

FDOC has developed means for avoiding waste and thereby reducing food costs. For example, pre-packaged food that is not consumed can be and is reused, and kitchens prepare the food based on prior participation rates. (DE-449-1 at 38:17-41:11.) As noted above, food orders are also based on prior participation rates, not on 100% participation. (DE-443-1 at 92:3-11.)

As for staffing, according to Alex Taylor, Chaplaincy Services Administrator for FDOC, FDOC intends to hire a total of 58 additional chaplains to help with the additional workload created by the RDP. (DE-442-1 at 66:10-14.) While Defendants have already hired many of the extra chaplains to deal with the RDP work, there is no evidence as to how much time the chaplains are spending on the RDP versus other chaplain duties. (DE-442-1 at 45:21-24; 49:7-

---

[12]The parties did not always submit entire depositions or hearing transcripts, only selected excerpts. Any citation to a deposition or hearing transcript is to the transcript page number, not the CM/ECF page number.

21.)  One of the newly hired chaplains testified that he spent three hours per day dealing with the RDP (DE-442-6 at 29:1-10.)  Thus, all his time is not spent on the RDP, although Defendants allot all of his salary to the cost of the RDP.  The same chaplain testified that despite being hired because of the RDP, he did not learn of the RDP until a month after he was hired.  (DE-442-6 at 32:17-33:7.)

During the time that the RDP has been offered, FDOC has not had to discontinue any programs because of the RDP's costs.  (DE-442-3 at 108:11-13; DE-443-7 at 97:15-19.) FDOC's Operations Management Consultant testified that FDOC is committed to providing kosher meals and that FDOC has come up with a way that the RDP could be sustainable.  (DE-443-6 at 43:14-21.)  Further, FDOC's Operations Manager in the Bureau of Contract Management and Monitoring is not aware of any lay-offs that have occurred because of the cost of the RDP.  (DE-442-3 at 108:16-20.)  He also testified that he believes that the cold menu currently in place for the CFO is "a sustainable model."  (DE-443-1 at 67:12-16.)  FDOC's Chief Procurement Officer also testified that the current kosher diet is sustainable going forward. (DE-443-5 at 120:17-19.)  FDOC's designated security expert testified at the preliminary injunction hearing that FDOC has determined that it can provide a statewide kosher diet plan consistent with its security interests.  (DE-443-4 at 52.)

## II.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001).  Once the moving

party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court must view the record and draw all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III. Discussion

### A.      Issues and Legal Standards

The United States asserts that Defendants' denial of a kosher diet and three of the RDP provisions, known as the ten percent rule, the zero tolerance rule, and doctrinal sincerity testing, violate RLUIPA. Defendants maintain that RLUIPA does not mandate that they provide kosher meals because cost containment is a compelling governmental interest which excuses them from

12

providing kosher meals.  Defendants also contend that the zero tolerance rule, the ten percent rule, and doctrinal sincerity testing do not run afoul of RLUIPA.

Under RLUIPA, no government may impose a substantial burden on a prisoner's religious exercise unless the burden "(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).  The burden is on the defendant to establish that its challenged policy meets these requirements. 42 U.S.C. § 2000cc-2(b).  RLUIPA recognizes that compliance "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."  42 U.S.C. § 2000cc-3(c).

As to the general denial of kosher meals, because neither side disputes that the failure to provide kosher meals imposes a substantial burden on a prisoner's religious exercise, the issues before the Court are whether denying such meals is in furtherance of a compelling state interest and is the least restrictive means of furthering that interest.  As for the three challenged RDP policies, Defendants have not conceded that these policies impose a substantial burden on a prisoner's religious exercise.  Thus, the issue of a substantial burden must be addressed before the issues of compelling state interest and the least restrictive means of furthering that interest.

If Defendants are in violation of RLUIPA, before the Court can issue an injunction, the Court must ensure that the injunctive relief the United States seeks meets the requirements of the Prison Litigation Reform Act (PLRA).  Under the PLRA, any injunctive relief:

> shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial

13

weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1).  The Eleventh Circuit interprets this provision to require a district court to make particularized findings as to each element of the injunction and perform a need-narrowness-intrusiveness analysis that provides a separate explanation as to each element.  *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000).  However, a court need not do this about any facts or factors not in dispute.  *Id.* at 785 n.8.

In discussing the requirements of the PLRA, the Supreme Court has explained:

Narrow tailoring requires a "fit" between the remedy's ends and the means chosen to accomplish those ends.  The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation. This Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution. But the precedents do not suggest that a narrow and otherwise proper remedy for a constitutional violation is invalid simply because it will have collateral effects.

*Brown v. Plata*, 131 S. Ct. 1910, 1939-40 (2011) (internal citations, quotation marks, and brackets omitted).

The Court will address each of the four alleged RLUIPA violations – the blanket denial of kosher meals and the three challenged RDP policies – separately.  As to each, it will first discuss whether the policy violates RLUIPA and, if necessary, will then address whether the United States' requested injunctive relief meets the PLRA's requirements.

14

B.      The Blanket Denial of Kosher Meals

1.      *The Blanket Denial of Kosher Meals Violates RLUIPA*[13]

Both sides read RLUIPA to support their position. The United States reads RLUIPA to require Defendants to provide kosher meals to those prisoners with a sincere religious belief, while Defendants argue that providing kosher meals is a policy decision which RLUIPA gives them the freedom to make for themselves. They cannot both be right.

Because neither side disputes that a blanket denial of kosher meals imposes a substantial burden on prisoners' religious exercise for those prisoners that have a sincere religious belief requiring them to eat kosher, the burden is on Defendants to demonstrate that denying such prisoners kosher meals (a) is in furtherance of a compelling state interest and (b) is the least restrictive means of achieving that interest. Throughout this litigation, Defendants have asserted that they have a compelling state interest in cost containment and that not providing a kosher diet is the least restrictive means of achieving cost containment. On the record before the Court, Defendants have not met their burden.

While the parties dispute the exact amounts involved, at the summary judgment hearing Defendants argued that despite this issue of material fact, summary judgment was still appropriate because the general range of the costs involved was not in dispute. The parties do not dispute that Defendants have already spent several million dollars implementing the RDP and that the RDP will cost approximately $3.554 per prisoner per day, with a total cost ranging between $384,400 and $12.3 million. Clearly, in pure numbers these amounts are not

_____

[13]As set out in the preliminary injunction, this issue is not moot, despite Defendants' institution of the RDP. *See* DE-106 at 14-15.

15

insignificant.  However, in an overall budget of nearly $2.3 billion per year, these amounts are relatively small.  Even assuming Defendants' worst case scenario of a cost of $12.3 million per year, that amounts to approximately five one thousandths (0.005) of Defendants' total budget.

At the summary judgment hearing, the United States maintained that, while the costs involved in providing kosher meals are substantial, Defendants have not shown that they have a compelling state interest in containing these particular costs because: (1) Defendants are already providing kosher meals and incurring the associated costs; (2) Defendants have not shown that the Florida prison system is different from the majority of state prison systems and the Federal Bureau of Prisons, which are all able to offer kosher meals to prisoners;[14] and (3) Defendants have not demonstrated that avoiding these costs actually furthers a compelling state interest.  Having considered the parties' submissions and arguments, the Court agrees with the United States: Defendants have not shown that they have a compelling state interest in denying kosher meals to prisoners with a sincere religious belief requiring them to eat kosher meals.

The United States' first argument appeals to common sense and, when combined with the United States' third argument, establishes that Defendants have not met their burden.  As the United States contends, it is hard to understand how Defendants can have a compelling state interest in not spending money that they are already voluntarily spending on the exact thing they claim to have an interest in not providing.  *See Moussazadeh v. Texas Department of Criminal Justice*, 703 F.3d 781, 795 (5th Cir. 2012) (holding that the defendant's compelling state interest in denying kosher meals to a prisoner at a particular institution was "dampened" by the fact that

---

[14]In fact, other than some limited evidence about the Federal Bureau of Prisons, Defendants have not provided any comparative evidence regarding other state prison systems.

defendant had been offering kosher meals to prisoners at another institution for years). Furthermore, not only are Defendants voluntarily spending the money on providing kosher meals, they have repeatedly represented that they are committed to providing kosher meals and that the current RDP is "sustainable," both monetarily and security-wise. Thus, Defendants' compelling state interest argument is substantially dampened by its voluntary decision to provide kosher meals.

Moreover, as the United States argues, Defendants have not shown how containing the costs associated with the RDP actually furthers any compelling state interest. Defendants, who bear the burden of proof on this issue, have not shown that the costs of the RDP are so onerous that they have had an effect on Defendants' operations. In fact, Defendants have not presented any evidence indicating that the RDP's costs have affected prison operations in any way.[15] There is no evidence that any programs have been cut, that any staff has been cut, or that there has been any harm to any aspect of Defendants' operations. Additionally, at the summary judgment hearing, the United States noted, and Defendants did not refute, that since the institution of the RDP, FDOC employees have received raises and the vacancy rates for various positions have

---

[15]Defendants cite to two unpublished decisions from the Eleventh Circuit, *Linehan v. Crosby*, 346 F. App'x 471 (11th Cir. 2009), and *Muhammad v. Sapp*, 388 F. App'x 892 (11th Cir. 2010), and one published case, *Martinelli v. Dugger*, 817 F.2d 1499 (11th Cir. 1987), for the proposition that the cost of providing religious meals is a compelling state interest that justifies a refusal to provide a religious diet. In both of the unpublished cases the plaintiffs/ prisoners appeared pro se and the record before the court appears to have been quite limited. Furthermore, under the Eleventh Circuit's rules, unpublished decisions "are not considered binding precedent." 11th Cir. R. 36-2. The published decision, *Martinelli*, was decided under a different standard than the one required by RLUIPA. *See Harris v. Chapman*, 97 F.3d 499, 503 (11th Cir. 1996) (recognizing that RFRA changed the standard relied on in *Martinelli*).

fallen.  Therefore, Defendants have not shown how saving the costs associated with the RDP would further any compelling state interest.

Defendants insist that the legislative history of RLUIPA makes clear that spending decisions are to be left to the discretion of state policy makers and, thus, merely because Defendants have currently chosen to provide kosher meals does not mean that RLUIPA mandates that Defendants provide them.  While Congress did recognize that it "expects that courts will give due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," Congress went on to state that "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalization will not suffice to meet the act's requirements." 146 Cong. Rec. 16698, 16699 (quoting S. Rep. No. 103-111 at 10 (1993)).  Furthermore, RLUIPA itself recognizes that it "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c).  Consequently, Defendants' interpretation of the legislative history cannot be reconciled with the language of the statute, which makes clear that RLUIPA may override some state fiscal policy decisions. *See Burwell v. Hobby Lobby Stores, Inc.*, – U.S. –, 134 S. Ct. 2751, 2781 (2014) (rejecting the view that RFRA can never require the government to spend money and explicitly stating that RFRA and RLUIPA may require the government to expend additional funds to accommodate citizens' religious beliefs).  The law is clear that under certain circumstances RLUIPA may mandate spending and thereby remove the spending decision from policymakers.  Given that Defendants' policymakers have already decided to incur the costs

18

associated with the RDP and that RLUIPA can mandate that costs be incurred, it is difficult to see how Defendants can argue that they have a compelling state interest not to incur the costs of the RDP.

Further, Defendants maintain that, as a policy matter, they must be able to discontinue the RDP if a fiscal crisis occurs.  This argument, however, is based on speculation about future possibilities.  Such speculation cannot create a compelling state interest.  *Rich v. Secretary, Florida Department of Corrections*, 716 F.3d 525, 533 (11th Cir. 2013) (stating that policies grounded on mere speculation will not suffice to meet RLUIPA's requirements); 146 Cong. Rec. 16698, 16699 (quoting S. Rep. No. 103-111 at 10 (1993) ("policies grounded on mere speculation . . . will not suffice to meet the act's requirements")).  Moreover, if a fiscal crisis, or anything else implicating a compelling state interest, were to occur nothing would prevent Defendants from seeking to modify any permanent injunction entered.  Additionally, as already noted, Defendants have repeatedly stated that the RDP is "sustainable."  Consequently, Defendants have not met their burden of establishing a compelling state interest in containing the costs associated with the RDP.

The United States also points out that the Federal Bureau of Prisons and most major prison systems in the United States offer kosher meals to prisoners and Defendants have failed to present any evidence as to why FDOC is different than these other prison systems.  In *Holt v. Hobbs*, – U.S. –, 135 S. Ct.  853, 866 (2015), the Supreme Court, finding that a policy violated RLUIPA, stated, "when so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course, and the Department failed to make that showing here."  The same has happened in this matter.  While Defendants

have repeatedly argued that budgetary issues underlie their decision, they have not presented any evidence as to how their budget issues would differ from those faced by other prison systems. In fact, the evidence presented has not even clearly explained exactly how the budget process works, let alone how it differs from other prison systems. Thus, Defendants have failed to explain why they "must take a different course" when it comes to providing kosher meals for their prisoners.

Even if Defendants had established that cost containment under these circumstances were a compelling state interest, they have not shown that an outright denial of kosher meals is the least restrictive means of achieving that goal. As the Supreme Court has held:

> The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use it.

*Id.* at 864 (internal citations, quotation marks, and brackets omitted). Defendants have not met this burden because they have not shown that they lack other means of providing kosher meals in a way that contains costs. Defendants have simply argued that the least restrictive means of cost containment is not incurring the cost. In support of this proposition, Defendants rely on *Knight v. Thompson*, 723 F.3d 1275 (11th Cir. 2013); however, *Knight* was vacated and remanded, 135 S. Ct. 1173 (2015), in light of the Supreme Court's holding in *Holt*.

Defendants further argue that all they have to do is offer a plausible explanation for their chosen policy that is supported by whatever evidence is available to them. However, Defendants have not done this. While Defendants have offered an explanation for their blanket denial of kosher meals, they have not offered evidence to support their policy. As noted above, despite the

20

alleged budget crisis, Defendants have begun providing kosher meals to prisoners, have not had to cut any programs, have given raises to their employees, and have filled more vacant positions.

Moreover, Defendants could contain costs, at least to an extent, if Defendants would actually use the tools available to them to reduce RDP participation rates. The evidence indicates that Defendants are not screening out RDP applicants who do not have a sincere religious belief requiring them to eat kosher meals. This is illustrated by the testimony of a chaplain who stated that, if applicants do not give a religious reason for wanting to participate in the RDP, he offers them multiple religious reasons to choose from. Further, the evidence clearly indicates that Defendants are not actively and consistently enforcing the RDP policies that can result in suspension or expulsion of those prisoners who demonstrate a lack of sincerity by eating or purchasing non-kosher foods on a regular basis, i.e. the current versions of the ten percent and zero tolerance rules which were agreed upon by the parties and the Court during the course of this litigation. If, as Defendants contend, containing the RDP's costs were such a compelling interest, Defendants would be doing everything in their power to enforce the RDP policies to ensure that only sincere prisoners participate and would thereby reduce the costs associated with the RDP. Thus, Defendants have at their disposal an alternative means to contain costs without burdening the religious exercise of those prisoners with a sincere religious belief requiring them to keep kosher. To date, however, Defendants have actively chosen not to use these alternative cost reduction methods.[16] Nor have Defendants shown that actively using these tools would not reduce or control participation rates and, thus, the costs incurred. Consequently, Defendants

---

[16]Ironically, elsewhere in their motion, Defendants defend the use of the ten percent and zero tolerance rules as necessary to ensure that only sincere prisoners participate in the RDP and to thereby control the RDP's costs.

have not shown that a blanket denial of kosher meals is the least restrictive means of achieving their compelling interest.

### 2. *Plaintiff is Entitled to a Permanent Injunction Requiring Defendants to Provide Kosher Meals*

The United States has satisfied the requirements of the PLRA and is, therefore, entitled to a permanent injunction requiring Defendants to provide kosher meals to those prisoners with a sincere religious belief requiring kosher meals. As set out above, there is a need for the injunction because Defendants' years-long, blanket denial of kosher meals to those prisoners with a sincere religious belief requiring them to eat kosher violates RLUIPA. Further, throughout this litigation, Defendants have maintained that RLUIPA does not require them to provide kosher meals and, therefore, they can stop doing so at anytime, regardless of whether there is a change of circumstances or just a change of heart. Moreover, Defendants have done just that in the past, having discontinued their prior kosher meals program, JDAP, against the advice of their own study group. *See* DE-49-2 at 5. Thus, there is a need for the requested injunction.

Simply requiring Defendants to provide kosher meals to those prisoners whose sincere religious beliefs require them is the most narrowly drawn way of achieving that goal. It limits to whom Defendants must provide the meals and does not attempt to accomplish anything other than to remedy the RLUIPA violation. Importantly, it leaves Defendants free to craft their own policies related to providing kosher meals consistent with RLUIPA. Because such an injunction would leave all of the particulars to Defendants, it would also be the least intrusive means of accomplishing the goal. Thus, such an injunction would reach no further than necessary to

correct the RLUIPA violation.  Further, there is no evidence in the record, and no arguments have been made, that such an injunction would have any effect on public safety or the operation of FDOC.  Consequently, an injunction requiring Defendants to provide kosher meals to all prisoners with a sincere religious belief for eating kosher meets the need-narrowness-intrusiveness requirements of the PLRA.

## C. The Zero Tolerance Rule

### 1.    The Zero Tolerance Rule Violates RLUIPA

Turning to the specific RDP provisions, the United States asserts that the zero tolerance rule imposes a substantial burden on prisoners with a sincere religious belief for keeping kosher because the rule automatically removes a prisoner from the RDP upon a single alleged infraction. Under the rule, after removal a prisoner must use the prison's grievance process to seek reinstatement.  During the grievance process, which can last up to thirty days, the prisoner must eat from the mainline.  Defendants respond that there is no substantial burden on prisoners' religious exercise because prisoners who are improperly suspended from the RDP will be reinstated if they file a grievance.  Furthermore, Defendants maintain that a prompt post-suspension grievance process is acceptable under the law.

Suspension before an opportunity for a prisoner to explain his position as to the alleged violation of the RDP rules does impose a substantial burden on the prisoner's religious exercise, particularly those prisoners who are removed in error.  This policy forces a prisoner, during the grievance process, to choose between violating his religious beliefs or not eating.  This constitutes a substantial burden on religious exercise.  *See Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 718 (1981) (under Free Exercise clause, a

23

substantial burden exists when substantial pressure is put on an adherent to modify his behavior and to violate his religious beliefs); *see also Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (stating that an individual's religious exercise has been substantially burdened if a "regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion"); *Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009) (holding that denial of non-meat diet during forty days of Lent constituted a substantial burden); *Lovelace v. Lee*, 472 F.3d 174, 188 (4th Cir. 2006) (inability to observe Ramadan by day-time fasting and attending prayer services for twenty-four of thirty days substantially burdened religious exercise).  The one case Defendants rely upon to support their policy, *United States v. Kaley*, 579 F.3d 1246, 1254 (11th Cir. 2009), is inapposite because it did not involve RLUIPA or religious exercise.  Moreover, in the Statement of Undisputed Facts, the parties both agree that the inability to consume a kosher diet substantially burdens the religious exercise of Florida prisoners with a sincere desire to keep kosher.  *See* DE-487 at ¶4.  Thus, Defendants implicitly recognize that the automatic suspension before investigation portion of this rule creates a substantial burden on a prisoner's religious exercise.  For the same reasons, any automatic suspension that requires the removed prisoner to grieve after the suspension creates a substantial burden on a prisoner's religious exercise.

The burden now shifts to Defendants to show that the zero tolerance policy and the post suspension grievance process are the least restrictive means for achieving a compelling state interest.  Defendants have not done this.  Defendants simply argue that they have a compelling state interest in cost containment and that they lack the manpower to provide pre-suspension hearings.  However, Defendants have offered no evidence supporting these assertions.  There is

24

no record evidence indicating how much money is saved by immediately suspending violators, at least some of whom will be reinstated into the RDP after going through the grievance process. Nor is there any evidence indicating how much more manpower would be used by a pre-suspension investigation versus the manpower used in the post-suspension grievance process. Thus, Defendants have not shown that they actually have a compelling state interest that is achieved by this policy. Moreover, Defendants presently conduct pre-suspension counseling/investigation for the nearly 5,000 prisoners on medical and vegan diets. Thus, Defendants have already shown that they have a less restrictive means of achieving any cost containment. Consequently, the zero tolerance rule and any rule that results in immediate suspension before investigation violates RLUIPA.

### 2. *Plaintiff is Entitled to a Permanent Injunction Enjoining Enforcement of the Zero Tolerance Rule*

An injunction enjoining the enforcement of the zero tolerance rule would meet the requirements of the PLRA. There is a need for the injunction because the rule violates RLUIPA. Enjoining enforcement of the rule is a narrowly drawn resolution of the issue. It only prevents Defendants from enforcing a single rule. It leaves Defendants free to find other methods to enforce the RDP, consistent with RLUIPA. Simply enjoining the rule does not dictate to Defendants what they must do; instead, it simply forecloses one method of ensuring that only sincere prisoners are enrolled in the RDP. It leaves Defendants wide latitude to fashion other methods of ensuring that only sincere prisoners partake in the RDP. Thus, such an injunction is narrowly drawn and is the least intrusive method of insuring that the Defendants' RDP does not violate prisoners' rights under RLUIPA.

### D. The Ten Percent Rule[17]

#### 1.    *The Ten Percent Rule Violates RLUIPA*

The United States asserts that the ten percent rule creates a substantial burden on a prisoner's religious exercise for two reasons: (1) it removes prisoners from the RDP based on an admittedly arbitrary number of meals missed during the course of a month and (2) like the zero tolerance policy, it removes prisoners from the RDP and then requires prisoners who wish to remain in the RDP to grieve their removal, leaving prisoners who have a sincere religious belief for keeping kosher to decide between violating their beliefs or not having their food needs met. Defendants do not argue in their papers that the ten percent rule does not create a substantial burden on a prisoner's religious exercise. Thus, it appears that Defendants have implicitly conceded this point. However, even if they have not, for the same reasons that the zero tolerance rule creates a substantial burden on religious exercise, the ten percent rule also creates a substantial burden, regardless of the arbitrariness of the ten percent cutoff.

Defendants maintain that the ten percent rule serves a compelling state interest – cost containment. However, again Defendants have failed to provide any evidence indicating how much waste is avoided and how much money is saved by the enforcement of this rule. Thus, all Defendants have done is say the magic words – cost containment – without any evidence to support their claims. Further, there is no evidence in the record indicating why ten percent is a better choice than five percent or fifteen percent or any other number. At the summary judgment

---

[17]In their supplemental memorandum [DE-486], Defendants state that they "will no longer seek to enforce the 10 percent rule" and that they will continue to provide pre-suspension notice to prisoners. However, Defendants have not agreed that the policy at issue violates RLUIPA or consented to entry of an order preventing reinstatement of the ten percent rule. Thus, for the same reasons set out in the preliminary injunction, these issues are not moot.

hearing, Defendants also asserted that this rule serves a security interest because all other special diets also have a ten percent rule and treating prisoners on special diets differently could lead to security issues.  However, there is no record evidence to support argument.

Defendants also argue that the United States should be "estopped" from challenging the ten percent rule because the Federal Bureau of Prisons (BOP) has a similar missed meal policy. Under the BOP's policy, missing six straight meals may result in a consultation with a chaplain. However, the BOP policy, unlike the ten percent rule, does not result in immediate suspension from a special meals program.  In fact, the BOP policy is applicable to all prisoners, regardless of what type of meal they eat.  Further, Defendants have provided no legal authority to support their estoppel argument.

Even if the Court were to accept cost containment as a compelling state interest, Defendants have not shown that enforcement of this rule is the least restrictive means of achieving that interest.  At the summary judgment hearing, the United States pointed out that Defendants already use other methods to avoid waste – tracking meal participation rates and planning accordingly; progressive preparation of meals; and reusing meal components that are unused.  All of these savings measures can help contain costs and avoid waste without imposing any burden on a prisoner's religious exercise.  Because Defendants have not shown how these cost-saving measures are less effective, or not effective, they cannot show that the ten percent rule is the least restrictive means of achieving a compelling state interest.  Consequently, the ten percent rule violates RLUIPA.

## 2.   *Plaintiff is Entitled to a Permanent Injunction Enjoining Enforcement of the Ten Percent Rule*

An injunction enjoining the enforcement of the ten percent rule would meet the requirements of the PLRA. There is a need for the injunction because the rule violates RLUIPA. Enjoining enforcement of the rule is a narrowly drawn resolution of the issue. It only prevents Defendants from enforcing a single rule. It leaves Defendants free to find other methods to enforce the RDP and to find ways to minimize costs. Simply enjoining the rule does not dictate to Defendants what they must do; instead, it simply forecloses one method of enforcement. It leaves Defendants wide latitude to fashion other methods of ensuring that waste is limited. Thus, such an injunction is narrowly drawn and is the least intrusive method of insuring that the Defendants' RDP does not violate prisoners' rights under RLUIPA.

## E.   Sincerity Testing[18]

### 1.   *Defendants' Doctrinal Sincerity Testing Does Not Violate RLUIPA*

The United States seeks summary judgment declaring that a question on the application for participation in the RDP violates RLUIPA. The specific question asks applicants to identify "specific law(s) connected to your belief or faith that require(s) you to eat a religious diet" (the Question). The United States asserts that the Question violates RLUIPA because it goes beyond

---

[18]At the summary judgment hearing the Court asked the parties to try to resolve this issue on their own. The parties indicated that they thought they would be able to resolve the issue. Thereafter, in its supplemental memorandum [DE-486], Defendants stated that they would no longer use the specific question at issue. However, they did not represent that they believed the question violated RLUIPA and elsewhere in their memorandum stated that they should not be enjoined from using the question. Further, the United States' reply argues that the Defendants' statements do not make the issue moot. Thus, the parties have not actually resolved the issue. For the same reasons set out in the preliminary injunction, Defendants' statement about use of the question does not moot the issue.

the level of permissible inquiry and furthers no compelling state interest.  Furthermore, having

stopped the Question's usage after entry of the preliminary injunction, Defendants have already

found that they can screen prisoners' sincerity in a less restrictive way.  Defendants assert that

use of the Question is permissible because the answer to the Question alone is not determinative

of a prisoner's acceptance into the RDP and, thus, does not burden the prisoner's religious

exercise.

RLUIPA defines "religious exercise" as including "any exercise of religion, whether or

not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  Thus,

RLUIPA contains a broad definition of religious exercise.  Further, "[p]rison chaplains may not

determine which religious observances are permissible because orthodox."  *Grayson v. Schuler*,

666 F.3d 450, 455 (7th Cir. 2012).  Thus, RLUIPA requires consideration of the sincerity of the

prisoner's belief, not whether a particular belief is supported by specific religious law or doctrine.

The United States challenges the Question asserting that it is impermissible because it

delves into issues of orthodoxy.  However, the case law the United States relies on does not say

that prison officials cannot use such a question as part of their sincerity determination; instead,

the cases warn against courts getting tangled up in issues of orthodoxy when sincerity is the

issue.  While prison officials may not be prohibited from using the Question, if they choose to

reinstate its use, they will be walking a fine line that, if crossed, will leave them making

orthodoxy determinations, which the law clearly prohibits them from making.

Regardless of whether Defendants choose to reinstate use of the Question, the United

States has not shown how the Question, as one part of the RDP's application and sincerity

testing, creates any burden, let alone a substantial burden, on a prisoner's religious exercise,

especially because there is no evidence that a prisoner's ability to answer this Question is at all determinative in Defendants' decision to admit a prisoner to the RDP. The United States has not presented any evidence demonstrating that asking the Question on the RDP application completely prevents a prisoner from engaging in religiously mandated activity, or forces a prisoner to participate in an activity prohibited by his or her religion. Thus, the United States has not met its burden of establishing that the use of the Question substantially burdens religious exercise. *See Smith v. Governor for Alabama*, 562 F. App'x 806, 813 (11th Cir. 2014) (prisoner failed to demonstrate that asking for authoritative sources in support of requests for religious items constituted a substantial burden when the failure to name a source did not mandate that the request be denied). Consequently, the Court need not reach the issue of whether the use of the Question is the least intrusive means of achieving a compelling state interest.

### 2. *Plaintiff is Not Entitled to a Permanent Injunction Preventing Use of Doctrinal Sincerity Testing*

Because the United States has not established a violation of RLUIPA, it is not entitled to entry of a permanent injunction enjoining the use of the Question. However, if circumstances were to change and evidence indicated that Defendants were using a prisoner's doctrinal knowledge as the determinant for admittance into the RDP, the United States would be free to seek modification of this Order and any permanent injunction entered.

Accordingly, it is

ORDERED that:

1.      The United States' Motion for Summary Judgment [DE-443] is GRANTED in part and DENIED in part:

    a.      The Motion is GRANTED as to Defendants' blanket denial of kosher meals, the ten percent rule, and the zero tolerance rule.

    b.      The Motion is DENIED as to doctrinal sincerity testing.

2.     Defendants' Renewed Motion for Summary Judgment [DE-442] is GRANTED in part and DENIED in part:

    a.      The Motion is GRANTED as to the doctrinal sincerity testing and the anti-bartering policy.

    b.      The Motion is DENIED in all other respects.

3.     By **May 6, 2015 at 10:00 a.m.** the parties shall submit proposed final judgments and permanent injunctions in accordance with this Order. The Court encourages the parties to meet and confer in order to submit a joint proposed final judgment and permanent injunction.

4.     All pending motions are DENIED as moot.

5.     This case is CLOSED.

DONE and ORDERED in Miami, Florida, this __30th__ day of April, 2015.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record